AO 106 (Rev. 04/10) Application for a Search Warrant (Modified: WAWD 10-26-18)

# UNITED STATES DISTRICT COURT

### for the
### Western District of Washington

| | | |
|---|---|---|
| In the Matter of the Search of | ) | FILED _____ LODGED _____ RECEIVED |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | **OCT 10 2019** |
| Three subject digital devices, more fully described in Attachment A | ) | CLERK U.S. DISTRICT COURT WESTERN DISTRICT OF WASHINGTON AT TACOMA BY _____ DEPUTY |
| | ) | Case No. MJ19-5206 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Three subject digital devices, more fully described in Attachment A, incorporated herein by reference.

located in the _____ Western _____ District of _____ Washington _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841, 846 | Drug distribution & conspiracy |
| 18 U.S.C. § 1956 | Money laundering |

The application is based on these facts:

✓ See Affidavit of TFO Ryan Hamilton, continued on the attached sheet.

☑ Delayed notice of 90 days (give exact ending date if more than 30 days: 01/07/2020 is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☐ by reliable electronic means; or: ☐ telephonically recorded.

_____
*Applicant's signature*

Ryan Hamilton, DEA Task Force Officer
*Printed name and title*

◉ The foregoing affidavit was sworn to before me and signed in my presence, or
◯ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: 10/10/19

_____
*Judge's signature*

City and state: Tacoma, Washington

J. Richard Creatura, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT

STATE OF WASHINGTON )
                                                 ) ss
COUNTY OF PIERCE )

I, Ryan J. Hamilton, Task Force Officer, Drug Enforcement Administration (DEA), United States Department of Justice, being first duly sworn on oath, depose and state:

## MY BACKGROUND AND QUALIFICATIONS

1.     I am a duly commissioned Police Investigator for the Lakewood Police Department and a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA). Accordingly, I am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. I have been employed by the Lakewood Police Department since October 2004, most recently in the Narcotics unit. From 2001 to October 2004, I was a sworn deputy of the Pierce County Sheriff's Department working on contract with the City of Lakewood. My formal training includes an Associate's Degree in Applied Science in Law Enforcement from Green River Community College and two additional years at the University of Washington working towards a Bachelor's Degree in Law, Society, and Justice (I left one quarter prior to graduation when I was hired by the Pierce County Sheriff's Department). My coursework included classes in Criminal Procedure and Criminal Law.

2.     Upon joining the Pierce County Sheriff's Department, I completed 720 hours of training at the Basic Law Enforcement Academy at the Washington State Criminal Justice Training Center (CJTC), where I was trained in the areas of Criminal Investigations, Narcotics Investigations, Interview Skills, Criminal Law, Criminal Procedures, Court Orders, and Search Warrants. I have also completed the 80-hour CJTC Undercover Operations/Investigations School and an 80-hour CJTC Basic Narcotics

1  Investigator course. I served as a Firearms Instructor from 2004 to 2019 and I am

2  currently a Field Training Officer (FTO) with the focus of training and evaluating newly

3  hired police officers.

4         3.    I am familiar with investigations of drug trafficking organizations, methods

5  of importation and distribution of controlled substances, and financial investigations. I

6  have participated in numerous investigations involving organizations trafficking in

7  controlled substances which have resulted in arrests of drug traffickers, seizures of

8  controlled substances, and assets. My training and experience have involved, among

9  other things: (1) the debriefing of defendants, witnesses, and informants, as well as others

10  who have knowledge of the distribution and transportation of controlled substances and

11  of the laundering and concealment of proceeds of drug trafficking; (2) surveillance; (3)

12  analysis of documentary and physical evidence; and (4) the "undercover" purchases of

13  controlled substances and negotiations of illegal money laundering transactions

14         4.    I have planned, participated in, and supervised the execution of more than

15  100 search warrants authorizing the search of locations associated with narcotic

16  traffickers and their co-conspirators, such as residences, businesses, storage facilities,

17  outbuildings, safety deposit boxes, and vehicles. I have testified in grand jury

18  proceedings and written reports in the course of investigations. I have monitored or

19  overheard numerous calls or meetings between informants or undercover agents, and

20  drug traffickers. These investigations have resulted in state and federal prosecutions of

21  individuals who have possessed, imported, or distributed controlled substances, including

22  marijuana, cocaine, methamphetamine, heroin, and prescription medications, as well as

23  the seizure of those illegal drugs and the proceeds from their sales. As a result of these

24  investigations, I have become familiar with methods and techniques used by narcotics

25  traffickers to import narcotics into the United States and distribute those narcotics within

26  the United States.

27         5.    I have participated in investigations which involved drug traffickers using

28  telephone communication as a means of communicating with their associates,

Affidavit of TFO Hamilton - 2
USAO 2019R00280

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  confidential informants, cooperating individuals and undercover officers.  I have also

2  worked and consulted with numerous law enforcement officers experienced in narcotics

3  investigations.  As a result, I am familiar with how drug traffickers speak to each other

4  and generally conduct business.  For example, I am aware that drug traffickers discussing

5  criminal matters over the phone often speak in code or in vague terms.  I am also aware

6  that these subjects frequently (1) provide false subscriber information to the service

7  providers, (2) use phones which are subscribed to under identities other than their own,

8  and (3) change phones in order to avoid detection by law enforcement.  This training and

9  experience forms the basis for my opinions expressed below.  All dates and times listed

10  below are approximate unless otherwise noted.

11                              **PURPOSE OF AFFIDAVIT**

12          6.      This Affidavit is submitted in support of an application for a warrant to

13  search three cellular phones (collectively, the "subject digital devices") seized on October

14  7, 2019, and presently in the secure custody of the DEA in Tacoma, Washington, for

15  evidence, fruits and instrumentalities of drug trafficking and money laundering crimes

16  committed by Doriam German MORENO-Rocha and Adrian Alberto SANCHEZ-

17  Esparza, in violation of Title 21, United States Code, Sections 841(a)(1) and 846, and

18  Title 18, United States Code, Section 1956, as further described in Attachment B.

19          7.      The subject digital devices are described as follows:

20                  a.      A Red Apple iPhone in a clear protective case (marked as DEA

21  Non-Drug Exhibit N-8);

22                  b.      A Black Samsung phone in a gray and black case (marked as DEA

23  Non-Drug Exhibit N-7; and

24                  c.      An Apple iPhone in a red case (marked as DEA Non-Drug Exhibit

25  N-9).

26          8.      The three subject digital devices were seized during a traffic stop and

27  subsequent arrest of Doriam German MORENO-Rocha (aka "Popeye") and Adrian

28  Alberto SANCHEZ-Esparza, which occurred on October 7, 2019, in Kent, Washington.

Affidavit of TFO Hamilton - 3
USAO 2019R00280

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

9.     I make this request based on the evidence described below, which establishes probable cause to believe that the subject digital devices were used to facilitate drug trafficking and money laundering crimes in the Western District of Washington and elsewhere in violation of 21 U.S.C. §§ 841 and 846, and 18 U.S.C. 1956, and that the information collected pursuant to the warrant will further the investigation of these violations.

10.     Specifically, the warrant would authorize the forensic examination of the subject digital devices for the purpose of identifying and seizing the electronically stored data more particularly described in Attachment B.

## SOURCES OF INFORMATION

11.     I have obtained the facts set forth in this Affidavit through my personal participation in the investigation described below; from oral and written reports of other law enforcement officers; from witnesses and informants cooperating with law enforcement, and from records, documents and other evidence obtained during this investigation.  I have obtained and read official reports prepared by law enforcement officers participating in this investigation and in other investigations.

12.     Since I am submitting this Affidavit for the limited purpose of establishing probable cause to obtain search warrants for the cell phones identified above, I have set forth only the facts that I believe are necessary to establish probable cause for these warrants.  As set forth herein, I believe Doriam German MORENO-Rocha and Adrian Alberto SANCHEZ-Esparza used these phones to facilitate drug trafficking and money laundering crimes.

## TECHNICAL TERMS

13.     Based on my training and experience, and consultation with other investigators, I use the following technical terms to convey the following meanings:

a.     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or

Affidavit of TFO Hamilton - 4
USAO 2019R00280

1  traditional "land line" telephones. A wireless telephone usually contains a "call log,"
2  which records the telephone number, date, and time of calls made to and from the phone.
   In addition to enabling voice communications, wireless telephones offer a broad range of
3  capabilities. These capabilities include: storing names and phone numbers in electronic
4  "address books;" sending, receiving, and storing text messages and e-mail; taking,
   sending, receiving, and storing still photographs and moving video; storing and playing
5  back audio files; storing dates, appointments, and other information on personal
6  calendars; and accessing and downloading information from the Internet. Wireless
   telephones may also include global positioning system ("GPS") technology for
7  determining the location of the device.

8          b.     Tablet: A tablet is a mobile computer, typically larger than a phone
9  yet smaller than a notebook that is primarily operated by touching the screen. Tablets
   function as wireless communication devices and can be used to access the Internet
10 through cellular networks, "Wi-Fi" networks, or otherwise. Tablets typically contain
11 programs called "apps," which, like programs on a personal computer, perform different
   functions and save data associated with those functions. Apps can, for example, permit
12 accessing the Web, sending and receiving e-mail, accessing banking sites, and
13 participating in Internet social networks. A common example of a tablet is an Apple
14 iPad.

15         c.     Internet: The Internet is a global network of computers and other
   electronic devices that communicate with each other. Due to the structure of the Internet,
16 connections between devices on the Internet often cross state and international borders,
17 even when the devices communicating with each other are in the same state.

18 **COMPUTERS, WIRELESS TELEPHONES/TABLETS, ELECTRONIC**
19 **STORAGE, AND FORENSIC ANALYSIS**

20     14.     Based on my knowledge, training, and experience, I know that digital

21 devices (including wireless telephones, tablets, and personal computers including

22 laptops) and electronic storage media can store information for long periods of time.

23 Similarly, things that have been viewed via the Internet are typically stored for some

24 period of time on the device used to access the Internet.   This information can sometimes

25 be recovered with forensic tools.

26     15.     There is probable cause to believe that things that were once stored on the

27 subject digital devices may still be stored there, for at least the following reasons:

28

a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

16.     As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrants, but also forensic evidence that establishes how the subject digital devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the subject digital devices because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal

Affidavit of TFO Hamilton - 6
USAO 2019R00280

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.     As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner and/or others with direct physical access to the computer. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.[1]  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last,

---

[1] For example, if the examination of a computer shows that: a) at 11:00am, someone using the computer used an internet browser to log into a bank account in the name of John Doe; b) at 11:02am the internet browser was used to download child pornography; and c) at 11:05 am the internet browser was used to log into a social media account in the name of John Doe, an investigator may reasonably draw an inference that John Doe downloaded child pornography.

Affidavit of TFO Hamilton - 7
USAO 2019R00280

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

17.     Because these warrants seek only permission to examine the subject digital devices already in law enforcement's possession, execution of these warrants does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrants at any time in the day or night.

**SUMMARY OF PROBABLE CAUSE**

18.     Investigators with the Tacoma DEA and King County Sheriff's Office have been conducting a joint investigation into the HERNANDEZ DTO since October of 2018. The HERNANDEZ DTO has been identified as a local drug distribution group that obtains heroin and methamphetamine from Mexico-based sources and local sources. The DTO then distributes these drugs in Western Washington. Investigators are currently intercepting (with court authorization) phones used by DTO head Daniel HERNANDEZ,

Affidavit of TFO Hamilton - 8
USAO 2019R00280

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 DTO runner Norberto FLORES-Lopez, and local source of supply Omar SALAZAR.
2 This is the fourth period of authorized interception during the immediate investigation of
3 the HERNANDEZ DTO.

4      19.    During these interception periods, investigators identified one of the DTO's
5 Mexico-based sources of supply as Juan MORENO-Rocha; MORENO-Rocha uses the
6 moniker "Cachin." Based on numerous intercepted calls, investigators knew that Juan
7 MORENO-Rocha supplied both heroin and methamphetamine to the DTO. Investigators
8 also learned from these intercepted communications that Juan MORENO-Rocha worked
9 with his brother, who went by the moniker "Popeye." Investigators believed that
10 "Popeye" could be Doriam MORENO-Rocha.

11      20.    On October 4, 2019, starting at 10:02 a.m., investigators intercepted
12 multiple text messages between Daniel HERNANDEZ (TT1) and Juan MORENO-Rocha
13 (52-667-572-0000) regarding a shipment of drugs that Juan MORENO-Rocha was
14 planning on shipping to HERNANDEZ. Investigators had determined that Mexican
15 telephone number 52-667-572-0000 was associated with Juan MORENO-Rocha because
16 HERNANDEZ referred to the user of this phone number as "Cachin," a known moniker
17 for Juan MORENO-Rocha. The text message exchange between HERNANDEZ (TT1)
18 and Juan MORENO-Rocha was in Spanish and has been transcribed by DEA-contracted
19 linguists as follows:

20     HERNANDEZ (Session 7301):    22 for the dark one, family.
21     HERNANDEZ (Session 7303):    I'll give you the information about the
22           water in an hour.
23     Juan MORENO-Rocha (Session 7315):   Okay, sounds good. Thanks.
24     HERNANDEZ (Session 7332):    I wanted to see if they were ready with
25           one of water, but they haven't taken
26           anything out.

27
28

Affidavit of TFO Hamilton - 9
USAO 2019R00280

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| | | |
|---|---|---|
| 1 | HERNANDEZ (Session 7334): | Honestly dude, I'm trying my best, but |
| 2 | | nothing is coming out, and I'm heading |
| 3 | | downhill very badly. |
| 4 | Juan MORENO-Rocha (Session 7336): | Dude, you had told me 30 of water and |
| 5 | | 25 of night, last time I had called you. |
| 6 | HERNANDEZ (Session 7338): | Yes, but these guys aren't ready, dude. |
| 7 | HERNANDEZ (Session 7340): | They haven't taken anything out. |

8    21.   Investigators later intercepted a call (Session 7344) between HERNANDEZ

9  and Juan MORENO-Rocha.  During this conversation, Juan MORENO-Rocha spoke to

10  HERNANDEZ about HERNANDEZ making a payment.  Juan MORENO-Rocha

11  indicated he had a shipment of drugs ready to go, but said the people in Mexico wanted to

12  get a payment from HERNANDEZ first.  Following this call, investigators then

13  intercepted multiple calls between HERNANDEZ and DTO members FLORES-Lopez

14  and Fernando BAUTISTA-Sanchez in which HERNANDEZ attempted to collect money

15  for the upcoming shipment of drugs.

16    22.   At 7:16 p.m., investigators intercepted a call (Session 7584) between

17  HERNANDEZ and Juan MORENO-Rocha.  During this call, Juan MORENO-Rocha told

18  HERNANDEZ, "I have a little surprise for you.  Just like last time."  HERNANDEZ

19  replied, "Oh, really?  What?  Is your brother here already or what?"  Investigators had

20  previously identified Juan MORENO-Rocha's brother as a person who used the moniker

21  "Popeye" and had tentatively identified him as Doriam German MORENO-Rocha, based

22  on investigators' searches of social media accounts and law enforcement databases.

23  During prior intercepted calls, investigators learned that "Popeye" worked with Juan

24  MORENO-Rocha to traffic drugs from Mexico to the United States.  Juan MORENO-

25  Rocha answered HERNANDEZ's question, stating, "Yes, the dude is around there, and I

26  wanted to see if he would call you….well, he is going to call you there, to see if you can

27  meet him there."  HERNANDEZ and Juan MORENO-Rocha continued to talk about

28  HERNANDEZ meeting up with "Popeye," apparently to talk about the current

Affidavit of TFO Hamilton - 10
USAO 2019R00280

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    arrangement between HERNANDEZ and both Juan MORENO-Rocha and "Popeye."

2    HERNANDEZ told Juan MORENO-Rocha he was glad that "Popeye" was here so that

3    he (HERNANDEZ) could "focus more on the street."

4          23.     Through additional intercepted calls, investigators learned that

5    HERNANDEZ was going to meet "Popeye" at an IHOP restaurant (at 610 Rainier

6    Avenue South, Renton, Washington) in the evening of October 4, 2019.  Investigators

7    also learned that FLORES-Lopez was going to pick HERNANDEZ and take

8    HERNANDEZ to the meet.  Investigators set up surveillance on the IHOP parking lot

9    and observed HERNANDEZ and FLORES-Lopez arrive at 8:27 p.m., in FLORES-

10   Lopez's father's vehicle (bearing Washington license BNS7043).

11         24.     At 8:26 p.m., investigators intercepted a call (Session 7609) between

12   telephone number 206-712-9375 and HERNANDEZ (TT1).  From the context of the call,

13   agents believed "Popeye" was the male user of 206-712-9375.  "Popeye" stated that he

14   was taking an exit off the highway and would be to HERNANDEZ soon.  At 8:37 p.m.,

15   investigators observed a silver BMW (bearing Washington license AGW4609) pull up to

16   the front of IHOP and park.  A Hispanic male exited the vehicle; HERNANDEZ met the

17   male at the door and they both entered the business.  Investigators researched the

18   licensing information for the BMW and learned it was registered to Juan MORENO-

19   Rocha's wife, Daniela Medina-Rosas at her father's address of 708 South Kenyan Street,

20   Seattle, Washington.

21         25.     Investigators entered the IHOP and located HERNANDEZ sitting with the

22   male who exited Medina-Rosas' BMW.  Investigators positively identified the male as

23   Doriam German MORENO-Rocha by comparison to an immigration enforcement photo

24   of Doriam MORENO-Rocha.  HERNANDEZ sat and talked with Doriam MORENO-

25   Rocha from approximately 8:37 p.m. to 10:24 p.m. before leaving.  FLORES-Lopez

26   picked up HERNANDEZ in the same vehicle they had arrived in, and Doriam

27   MORENO-Rocha left in the same vehicle he had arrived in.

28

Affidavit of TFO Hamilton - 11
USAO 2019R00280

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

26.     On October 5, 2019, investigators intercepted multiple text messages between HERNANDEZ (TT1) and DTO member Fernando BAUTISTA-Sanchez.  These texts started initially talking about "Popeye" wanting to meet with BAUTISTA-Sanchez, but BAUTISTA-Sanchez not wanting to.  At 10:44 a.m., investigators intercepted a text (Session 7669) from HERNANDEZ (TT1) to BAUTISTA-Sanchez that read, "Honestly man, it's good he came, I told pariente to not send water and he sent like 15 k."  From other information learned during the course of this investigation, investigators know "Pariente" to be a reference to Juan MORENO-Rocha and "15 k" to mean 15 kilograms. "Water" is a common code word for methamphetamine.

27.     On October 6, 2019, at 8:30 p.m., investigators intercepted a call (Session 8199) between Doriam MORENO-Rocha (206-712-9375) and HERNANDEZ (TT1). Both parties greeted each other.  Doriam MORENO-Rocha then said, "I was checking, you told me sixteen, but it's fifteen."  HERNANDEZ replied, "No, it's sixteen."  Doriam MORENO-Rocha said, "No, it's five, five, four, and one."  HERNANDEZ replied, "Really?"  Investigators believe this meant that HERNANDEZ had made a $15,000.00 cash payment to Doriam MORENO-Rocha but thought he had paid $16,000.00.

28.     Doriam MORENO-Rocha then appeared to ask HERNANDEZ if the other payment was going to be correct.  Doraim MORENO-Rocha said, "I just checked it.  I checked it, and then I said, 'I am going to call you right away.'  The other ones, are you sure are the three two?  Because I told them over there that what it was."  HERNANDEZ replied, "Thirty-two, yes.  There are four packs of, of five, and then, uh, twelve of, of one."  This suggested that HERNANDEZ had packaged $32,000.00 cash into four bundles of $5,000.00 each (totaling $20,000.00) and twelve bundles of $1,000.00 each (totaling $12,000.00).  This also suggested to investigators that HERNANDEZ was sending a total of $47,000.00 to Mexico, via Doriam MORENO-Rocha, knowing that a shipment of drugs was on its way to him (HERNANDEZ) in Washington.

29.     Doriam MORENO-Rocha and HERNANDEZ continued to talk about the shipment of drugs that was on its way.  HERNANDEZ told Doriam MORENO-Rocha

1    that he (HERNANDEZ) was going to bring over gloves, a vacuum sealer, and tape.

2    HERNANDEZ then said, "We are going to check one, we are going to open one right?

3    So, we can see it?" Doriam MORENO-Rocha replied, "That's what I was thinking,

4    because it seems that one of them is one-six. We can open it, and then we'll divide that

5    one among us. This way we don't have to alter it, and avoid shrink it." HERNANDEZ

6    then replied, "Yes, we need to open it and check it. Valedor [ISLAS-Estrada] has

7    aluminum over there." Investigators believe that Doriam MORENO-Rocha was

8    implying that one of the inbound packages weighed only 16 ounces, and that they could

9    open that one to test it. When HERNANDEZ stated that ISLAS-Estrada has aluminum,

10    that suggested to investigators that heroin was included in the shipment with

11    methamphetamine (since burning heroin on aluminum foil is a way in which the quality

12    of heroin can be tested).

13           30.    HERNANDEZ and Doriam MORENO-Rocha then discussed the shipment

14    itself. Doriam MORENO-Rocha told HERNANDEZ that the shipment was going to

15    arrive around 2:00 a.m. to 3:00 a.m. that night/morning. Doriam MORENO-Rocha and

16    HERNANDEZ agreed to meet at ISLAS-Estrada's residence around 6:00 a.m. (on

17    October 7, 2019) to get the drugs out of the load vehicle.

18           31.    On October, 7, 2019, at approximately 5:45 a.m., investigators set up

19    surveillance on ISLAS-Estrada's residence (20631 26th Avenue South, Seatac,

20    Washington). Investigators checked the footage from mounted surveillance video camera

21    that points northbound on 26th Avenue South towards ISLAS-Estrada's residence.

22    Investigators noticed that an SUV had arrived at ISLAS-Estrada's residence at 2:31 a.m.,

23    and that the SUV appeared to have been followed by ISLAS-Estrada's vehicle (a white

24    2006 Honda Civic bearing Washington license BGY5960). Investigators also observed

25    (via the surveillance camera) that Doriam MORENO-Rocha appeared to arrive at ISLAS-

26    Estrada's residence at 6:40 a.m. Investigators on physical surveillance were able to

27    confirm that the last two digits on the license plate of a vehicle that had pulled up outside

28    the residence were "09," which was consistent with the license plate on the BMW

Affidavit of TFO Hamilton - 13
USAO 2019R00280

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    (Washington AGW4609) Doriam MORENO-Rocha had previously driven to meet
2    HERNANDEZ.  Investigators noticed a silver Volkswagen arrive around the same time
3    (around 6:40 a.m.).  Investigators knew that HERNANDEZ had previously used a silver
4    Volkswagen (bearing Washington license AVP1571) in the past, and that BAUTISTA-
5    Sanchez had been using it recently.

6           32.    Investigators observed several people walking in and around the area of the
7    garage/carport, which is to the south of the residence.  This was consistent with the
8    contents of the prior intercepted call regarding having to get the drugs out of the load car.
9    At 7:38 a.m., investigators saw (via the mounted surveillance camera and physical
10   surveillance) HERNANDEZ walk away from the area of ISLAS-Estrada's garage and
11   toward the Volkswagen.  It did not appear that HERNANDEZ was carrying anything in
12   his hands when he went to the car; an intercepted call suggested that he was going to go
13   pick up his nephew and drive him to school.

14          33.    At 8:16 a.m., investigators (via the mounted surveillance camera and
15   physical surveillance) noticed that someone drove Doriam MORENO-Rocha's BMW
16   into ISLAS-Estrada's garage area where investigators suspect the load vehicle was
17   parked.  To investigators, there appeared to be no reason to do so unless the men were
18   planning on putting something into the vehicle and wanted to do it in privacy.  At 8:37
19   p.m., investigators observed the BMW back out of ISLAS-Estrada's garage area and
20   drive away.  Investigators confirmed the license plate was Washington AGW4609, i.e.,
21   the same vehicle Doriam MORENO-Rocha was seen previously using.

22          34.    At 8:48 a.m., investigators conducted a traffic stop of the BMW.  Doriam
23   MORENO-Rocha was driving and Adrian Alberto SANCHEZ-Esparza was the
24   passenger.  Both were identified through their respective Mexico-issued photo IDs.
25   Because Doriam MORENO-Rocha and Adrian Alberto SANCHEZ-Esparza were both
26   acting nervous, investigators placed them in handcuffs for officer safety.  A drug-
27   detection K9 gave a positive indication on the passenger's door area of the car.

28

Affidavit of TFO Hamilton - 14
USAO 2019R00280

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

35.     Doriam MORENO-Rocha was in possession of the red Apple iPhone (Exhibit N-8).  Adrian SANCHEZ-Esparza was in possession of the Apple iPhone (Exhibit N-9.  The third cell phone (the Samsung in a black/gray case, Exhibit N-7) was in the center console of the vehicle.

36.     Investigators determined Doriam MORENO-Rocha and Adrian SANCHEZ-Esparza were both in the county illegally.  Officers with U.S. Immigration and Customs Enforcement (ICE) responded and took custody of Doriam MORENO-Rocha and Adrian SANCHEZ-Esparza.  Investigators noticed that both of Adrian SANCHEZ-Esparza's hands were recently cut up and scraped; these injuries were consistent with him reaching into a trap or void area of a vehicle used to secrete narcotics.  Investigators took photos of his hands.

37.     Investigators then searched the BMW and located a large duffel type bag in the trunk of the vehicle.  Inside this bag, investigators located approximately 15 kilograms of suspected methamphetamine and 5.5 kilograms of suspected heroin in addition to cash and other evidentiary items.  The drugs and the evidentiary items were transported back to the DEA Tacoma and placed in the secure evidence room.

38.     At 12:12 p.m., investigators intercepted a call (Session 8228) between HERNANDEZ (TT1) and ISLAS-Estrada pertaining to HERNANDEZ and Juan MORENO-Rocha trying to locate Doriam MORENO-Rocha.  HERNANDEZ asked ISLAS-Estrada what time "Popeye" and "Zorro" left.  Investigators had intercepted several calls previously where "Zorro" was described as a courier for the MORENO-Rocha brothers, so this call suggested that "Zorro" was Adrian SANCHEZ-Esparza.  ISLAS-Estrada replied to HERNANDEZ that both Doriam MORENO-Rocha and Adrian SANCHEZ-Esparza had left in the BMW with the drugs that had just been shipped up to Washington.

Affidavit of TFO Hamilton - 15
USAO 2019R00280

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## COMMON CHARACTERISTICS OF DRUG TRAFFICKERS
## AND MONEY LAUNDERERS

39.     Based upon my training, experience, and participation in this and other investigations involving narcotics trafficking and money laundering, my conversations with other experienced investigators and law enforcement investigators with whom I work, and interviews of individuals who have been involved in money laundering and the trafficking of methamphetamine, cocaine, fentanyl and other drugs, I have learned and know the following.

40.     Drug traffickers use mobile electronic devices including cellular telephones, tablets and other wireless communication devices to conduct their illegal trafficking business and money laundering activities.  As described below, such equipment often contains evidence of these illegal activities.

41.     Traffickers of controlled substances commonly maintain addresses, vehicles, or telephone numbers that reflect names, addresses, vehicles, and/or telephone numbers of their suppliers, customers, and associates in the trafficking organization, and it is common to find drug traffickers keeping records of said associates in cellular telephones and other electronic devices.  Traffickers often maintain cellular telephones for ready access to their clientele and to maintain their ongoing narcotics business.  Traffickers frequently change their cellular telephone numbers to avoid detection by law enforcement, and it is common for traffickers to use more than one cellular telephone at any one time.

42.     Drug traffickers and Money Launderers use cellular telephones as a tool or instrumentality in committing their criminal activity.  They use them to maintain contact with their suppliers, distributors, and customers.  They prefer cellular telephones because, first, they can be purchased without the location and personal information that landlines require.  Second, they can be easily carried to permit the user maximum flexibility in meeting associates, avoiding police surveillance, and traveling to obtain or distribute drugs and money.  Third, they can be passed between members of a drug and money

Affidavit of TFO Hamilton - 16
USAO 2019R00280

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    conspiracy to allow substitution when one member leaves the area temporarily.  Since

2    cellular phone use became widespread, every drug dealer and money launderer I have

3    interacted with has used one or more cellular telephones for his or her drug and money

4    business.  I also know that it is common for drug traffickers and money launderers to

5    retain in their possession phones that they previously used, but have discontinued actively

6    using, for their drug trafficking and money laundering business.  Based on my training

7    and experience, the data maintained in a cellular telephone used by a drug dealers and

8    money launderers is evidence of a crime or crimes.  This includes the following:

9          a.    The assigned number to the cellular telephone (known as the mobile

10   directory number or MDN), and/or the identifying telephone serial number (Electronic

11   Serial Number (ESN), Mobile Identification Number (MIN), International Mobile

12   Subscriber Identity (IMSI) number, or International Mobile Equipment Identity (IMEI)

13   number) are important evidence because they reveal the service provider, allow agents to

14   obtain subscriber information, and uniquely identify the telephone.  This information can

15   be used to obtain toll records, to identify contacts by this telephone with other cellular

16   telephones used by co-conspirators, to identify other telephones used by the same

17   subscriber or purchased as part of a package, and to confirm if the telephone was

18   contacted by a cooperating source.

19         b.    The stored list of recent received calls and sent calls is important

20   evidence.  It identifies telephones recently in contact with the telephone user.  This is

21   valuable information in a drug investigation because it will identify telephones used by

22   other members of the organization, such as suppliers, distributors and customers, and it

23   confirms the date and time of contacts.  If the user is under surveillance, it identifies what

24   number he called during or around the time of a surveilled drug transaction or meeting.

25   Even if a contact involves a telephone user not part of the conspiracy, the information is

26   helpful (and thus is evidence) because it leads to friends and associates of the user who

27   can identify the user, help locate the user, and provide information about the user.

28

Affidavit of TFO Hamilton - 17
USAO 2019R00280

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 Identifying a defendant's law-abiding friends is often just as useful as identifying his
2 drug-trafficking and money laundering associates.

3         c.     Stored text messages are important evidence, similar to stored
4 numbers. Agents can identify both drug associates, and friends of the user who likely
5 have helpful information about the user, his location, and his activities.

6         d.     Photographs and videos on a cellular telephone are evidence because
7 they help identify the user, either through his or her own picture, or through pictures of
8 friends, family, and associates that can identify the user. Pictures also identify associates
9 likely to be members of the MLDTO organization. Also, digital photos often have
10 embedded "geocode" information within them. Geocode information is typically the
11 longitude and latitude where the photo was taken. Showing where the photo was taken
12 can have evidentiary value. This location information is helpful because, for example, it
13 can show where coconspirators meet, where they travel, and where assets might be
14 located.

15         e.     Stored address records are important evidence because they show the
16 user's close associates and family members, and they contain names and nicknames
17 connected to phone numbers that can be used to identify suspects.

18         f.     It is common for drug traffickers and money launderers to use
19 encrypted means of communication, such as WhatsApp, Silent Circle, Signal, Wickr, and
20 Telegram, to attempt to avoid detection by law enforcement. It is common for drug
21 traffickers and money launderers to install and use these apps on their phones in order to
22 make encrypted calls and send encrypted messages.

23     43.     As outlined above, drug traffickers and in particular money launderers also
24 use computers to conduct their illicit activities. Many common cell phone and tablet
25 messaging applications, including but not limited to WhatsApp and Apple's iMessage
26 have counterparts on laptop and desktop computers. In addition, as outlined above, it is
27 common for individuals, including in particular money launderers, to access online
28 banking information via a computer.

Affidavit of TFO Hamilton - 18
USAO 2019R00280

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## SEARCH TECHNIQUES

44.     Based on the foregoing, and consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, the warrants I am applying for will permit imaging or otherwise copying all data contained on the subject digital devices, and will specifically authorize a review of the media or information consistent with the warrants.

45.     In accordance with the information in this Affidavit, law enforcement personnel will execute the search of the subject digital devices pursuant to these warrants as follows:

a.     **Securing the Data**

i.     In order to examine the ESI in a forensically sound manner, law enforcement personnel with appropriate expertise will attempt to produce a complete forensic image, if possible and appropriate, of the subject digital devices.[2]

ii.     Law enforcement will only create an image of data physically present on or within the subject digital devices.  Creating an image of the subject digital devices will not result in access to any data physically located elsewhere.  However, subject digital devices that have previously connected to devices at other locations may contain data from those other locations.

//

//

---

[2] The purpose of using specially trained computer forensic examiners to conduct the imaging of digital devices or other electronic storage media is to ensure the integrity of the evidence and to follow proper, forensically sound, scientific procedures.  When the investigative agent is a trained computer forensic examiner, it is not always necessary to separate these duties.  Computer forensic examiners often work closely with investigative personnel to assist investigators in their search for digital evidence.  Computer forensic examiners are needed because they generally have technological expertise that investigative agents do not possess.  Computer forensic examiners, however, often lack the factual and investigative expertise that an investigative agent may possess on any given case.  Therefore, it is often important that computer forensic examiners and investigative personnel work closely together.

Affidavit of TFO Hamilton - 19
USAO 2019R00280

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

b.    **Searching the Forensic Images**

i.    Searching the forensic images for the items described in Attachment B may require a range of data analysis techniques. In some cases, it is possible for agents and analysts to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant, and law enforcement may need to conduct more extensive searches to locate evidence that falls within the scope of the warrant. The search techniques that will be used will be only those methodologies, techniques and protocols as may reasonably be expected to find, identify, segregate and/or duplicate the items authorized to be seized pursuant to Attachment B to this Affidavit.

## REQUEST FOR SEALING

46.    It is respectfully requested that this Court issue an Order sealing, until further Order of the Court, all papers submitted in support of this application, including the Affidavit and search warrants. I believe that sealing these documents is necessary because the warrants are relevant to an ongoing investigation into the criminal organization. Premature disclosure of the contents of this Affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

## CONCLUSION

47.    For the reasons set forth above, I believe there is probable cause to believe that evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), 846 and Title 18, United States Code, Section 1956 will be found in a search of the three subject digital devices described above, which are presently

//

//

//

Affidavit of TFO Hamilton - 20
USAO 2019R00280

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  in the secure custody of the DEA in Tacoma, Washington.

2

3

4  RYAN J. HAMILTON,

5  Task Force Officer
   Drug Enforcement Administration

6

7  Subscribed and sworn to before me this _10th_ day of October, 2019.

8

9

10  J. RICHARD CREATURA
    UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Affidavit of TFO Hamilton - 21
USAO 2019R00280

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## ATTACHMENT A

The property to be searched is more particularly described as follows:

      a.    **A Red Apple iPhone in a clear protective case, marked as DEA Non-Drug Exhibit N-8.**

      b.    **A Black Samsung Phone in a gray and black case, marked as DEA Non-Drug Exhibit N-7.**

      c.    **An iPhone in a red case, marked as DEA Non-Drug Exhibit N-9.**

All of these items (collectively, the "subject digital devices) are presently in the secure custody of the DEA in Tacoma, Washington

This warrant authorizes the forensic examination of the subject digital devices for the purpose of identifying the electronically stored information described in Attachment B.

Affidavit of TFO Hamilton - 22
USAO 2019R00280

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1                                             **ATTACHMENT B**

2      1.      All records on the subject digital devices described in Attachment A that

3 relate to violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1) and 846

4 and Title 18, United States Code, Section 2, and involve Doriam German MORENO-

5 Rocha and Adrian Alberto SANCHEZ-Esparza since October 2018, including:

6            a.      Evidence of the trafficking, importation, exportation, and

7 manufacture of controlled substances, including methamphetamine and heroin;

8            b.      lists of customers and related identifying information;

9            c.      types, amounts, and prices of drugs trafficked as well as dates,

10 places, and amounts of specific transactions;

11            d.      any information related to sources of drugs (including names,

12 addresses, phone numbers, or any other identifying information);

13            e.      any information recording Doriam German MORENO-Rocha and

14 Adrian Alberto SANCHEZ-Esparza's schedule or travel from October 2018 to the

15 present;

16            f.      all bank records, checks, credit card bills, account information, and

17 other financial records, including all records of the transfer, deposit, wiring or other

18 transmission of funds between accounts, and records of access of financial or banking

19 sites on the internet or via applications;

20            g.      all records of applications used for communication purposes and/or

21 to access financial and banking sites;

22            g.      all records of communications (including but not limited to text

23 messages, internet-based messaging applications (including but not limited to WhatsApp,

24 Silent Signal, Wikr, iMessage, Skype, or similar applications and services) regarding the

25 trafficking, importation, exportation and manufacture of controlled substances and/or the

26 movement or other transfer of funds

27            h.      photographs or other images (including but not limited to screen

28 captures) of controlled substances and/or of records of the deposit or transfer of funds.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    2.    Evidence of user attribution showing who used or owned the subject digital

2    devices at the time the things described in this warrant were created, edited, or deleted,

3    such as logs, phonebooks, saved usernames and passwords, documents, and browsing

4    history;

5    3.    Records evidencing the use of the Internet Protocol addresses used to

6    communicate with various messaging or banking apps, including:

7         a.    records of Internet Protocol addresses used;

8         b.    records of Internet activity, including firewall logs, caches, browser

9    history and cookies, "bookmarked" or "favorite" web pages, search terms that the user

10   entered into any Internet search engine, and records of user-typed web addresses.

11   4.    As to the wireless telephones and tablets, this warrant also authorizes the

12   following information to be searched for and seized:

13        i.    Assigned number and identifying telephone serial number (ESN,
                MIN, IMSI, or IMEI);
14        ii.   Stored list of recent received, sent, or missed calls;
15        iii.  Stored contact information;
16        iv.   Photographs as noted above, or photographs that may show the user
                of the phone and/or co-conspirators, including any embedded GPS
17              data associated with these photographs; and
18        v.    Stored text messages and emails as noted above including Apple
                iMessages, Silent Circle, Wikr, Facebook messenger, Blackberry
19              Messenger messages or other similar messaging services where the
                data is stored on the telephone.
20

21   As used above, the terms "records" and "information" include all of the foregoing

22   items of evidence in whatever form and by whatever means they may have been created

23   or stored, including any form of computer or electronic storage (such as flash memory or

24   other media that can store data) and any photographic form.

25

26

27

28

Affidavit of TFO Hamilton - 24
USAO 2019R00280

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970